UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JESSICA D., | : | |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | No. 3:23-cv-605 (MPS) |
| | : | |
| KILOLO KIJAKAZI, | : | |
| | : | |
| *Defendant*. | : | |

## RECOMMENDED RULING

Plaintiff brings this administrative appeal from the decision of the Commissioner of the

Social Security Administration denying her application for disability insurance benefits.  For the

reasons below, the undersigned recommends that plaintiff's Motion to Reverse the Decision of

the Commissioner, ECF 18, be GRANTED, and the Commissioner's Motion to Affirm, ECF 22,

be DENIED.

### A.  LEGAL STANDARDS

#### 1.  Disability and eligibility

A claimant is disabled under the Social Security Act if he or she is "unable to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death, or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To be

eligible for Title II disability insurance benefits, the claimant must establish the onset of

disability during the period in which he or she was insured based on quarters of qualifying work. 42 U.S.C. § 423; *see also Arnone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989).

## 2. Commissioner's five-step review

The Commissioner of Social Security is authorized to make findings of fact and decide disability applications, *see* 42 U.S.C. § 405(b)(1), in accordance with the five-step sequential evaluation process provided in 20 C.F.R. § 404.1520. (1) First, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. (2) If not, the Commissioner determines whether the claimant has a medically determinable impairment or combination of impairments that are "severe," meaning that it "significantly limits" the claimant's physical or mental ability to do basic work activities. (3) If the claimant has a severe impairment or combination of impairments, the Commissioner evaluates whether, based solely on the medical evidence, the claimant has an impairment that "meets or equals" an impairment listed in Appendix 1, Subpart P, No. 4 of the regulations (the "Listings") and that either is expected to result in death or has lasted or will last for at least 12 months. [1] If so, the claimant is disabled. (4) If not, the Commissioner determines whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his or her past work. [2] (5) If not, the Commissioner determines whether there is other work in the national economy which the claimant can perform in light of his or her RFC, age, education, and work experience. *See* 20 C.F.R. § 404.1520. The claimant bears the burden of proof on the first four steps, and the

---

[1] *See* 20 C.F.R. § 404.1509 (durational requirement).

[2] Residual functional capacity is the most a claimant can do in a work setting despite his or her limitations. 20 C.F.R. § 404.1545.

Commissioner bears the burden of proof on the final step.  *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

The Commissioner's authority to make these findings and decisions is delegated to an administrative law judge ("ALJ").  *See* 20 C.F.R. § 404.929.  A claimant may request review of an ALJ's decision by the Appeals Council.  *See* 20 C.F.R. § 404.967.  If the Appeals Council declines review or affirms the ALJ's decision, the claimant may appeal to the United States District Court.  42 U.S.C. § 405(g).

### 3.  Court's review on appeal

A district court reviewing the Commissioner's final decision is performing an appellate function, *see Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981), and has the power to affirm, modify, or reverse the Commissioner's decision based on its review of the briefs and the administrative record.  *See* 42 U.S.C § 405(g).  "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error."  *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted).

## B.  BACKGROUND

### 1.  Procedural History

In February 2021, plaintiff filed an application for disability insurance benefits alleging a disability onset date of March 13, 2020.  R. 208-10. The claim was denied at the initial review and reconsideration levels, and plaintiff requested a hearing. R. 100-101, 131-32.  On March 1, 2022, ALJ John Noel conducted a telephonic hearing at which plaintiff and a vocational expert testified.  R. 42-90.  On March 16, 2022, the ALJ issued a written decision denying plaintiff's claim.  R. 22-36.  Plaintiff's request for review was denied by the Appeals Council, R. 1-5, and

plaintiff filed this action on April 10, 2023.

## 2. Alleged conditions

In her February 2021 application, plaintiff listed her impairments as posttraumatic stress disorder ("PTSD"), bipolar 1, anxiety, personality disorder, and depression disorder.  R. 212.  At the March 2022 hearing, plaintiff's counsel stated that bipolar, anxiety, and PTSD were her primary conditions, and also stated that her "mental status and capacity [were] not well" due to side effects of mental health medications.  R. 58-59. [3]

## 3. Treatment history and medical opinions (Dr. Hillbrand and Dr. Wiseman)

### a. History prior to disability application

Plaintiff's treatment history reveals ongoing struggles with mental health and substance abuse, including inpatient stays for mental health treatment and detox.  The earliest record on file is a March 2019 summary of plaintiff's termination from outpatient psychiatric therapy at United Services.  R. 290-92.  It states that she initially sought treatment in June 2015 for complaints of bipolar mood symptoms, insomnia, and anxiety after she had gone off her medications due to loss of insurance.  R. 290.  The June 2015 admission diagnosis included bipolar 1, PTSD, severe opioid use disorder, moderate cannabis use disorder, and severe alcohol use disorder.  *Id.*  The record mentions a referral for medication management and also notes that she attended individual therapy 26 times between June 2015 and October 2018 and cancelled or failed to attend 18 appointments.  R. 290-91.

In October 2019, plaintiff was referred to an intensive outpatient program but, after attending intake, she went instead to the Windham Hospital Emergency Department ("ED")

---

[3] In the hearing decision, the ALJ also discussed plaintiff's physical impairments, R. 24, but plaintiff raises no claims of error as to physical impairments.

complaining of suicidal thoughts.  R. 291, 344.  She denied significant substance use at the time, stating that she used cannabis only occasionally and drank alcohol rarely.  *Id.*  She spent two weeks in inpatient treatment at Backus Hospital, then was discharged to outpatient treatment three times per week.  R. 278.  Backus clinicians prescribed psychiatric medications during her stay, and her primary care physician ("PCP") Dana Wiseman, M.D. took over medication management thereafter.  R. 624.

In December 2019, plaintiff sought to restart individual therapy at United Services, reporting that she was out of medications and was feeling very anxious, paranoid at work, and hypervigilant to an extent she was unable to leave the house or drive.  R. 293-98.  She canceled her two subsequent appointments.  R. 298.  At her next and only appointment in January 2020, she denied current alcohol abuse.  R. 300.  She missed her next two appointments.  R. 302.

Meanwhile, plaintiff returned to full-time work at a lumber mill, working 50+ hours per week.  R. 624.  Plaintiff held that job from July 2018 through March 2020.  R. 213.  In a March 2020 hospital note, she reported that she quit after a romantic relationship with her boss ended.  R. 392, 401.  At other points in the record, she stated that she lost the job due to the pandemic.  R. 64, 615.

### b.  Crisis treatment in 2020

In March 2020, plaintiff called an ambulance due to suicidal thoughts.  She reported that over the prior two months she experienced increased depressive symptoms, poor sleep, and weight loss.  She admitted she had not taken psychiatric medications consistently, had broken up with her boyfriend (who was her boss), left her job, and was drinking ten "nips" (colloquially, a quantity equivalent to one shot) per day.  R. 286.  She spent twelve days inpatient at the Hartford Hospital Institute of Living, during which she completed alcohol detox and restarted psychiatric

medications.  R. 283-87.  Upon discharge, she reported improved mood, less anxiety and increase in feeling hopeful for the future.  R. 286.  During the admission, she interacted with peers, attended offered groups, and was an active participant.  *Id.*

In April 2020, during the pandemic, plaintiff sought mental health services at Community Health Resources but could not start telehealth treatment due to incompatible technology.  R. 615, 1138-52.  In May 2020, her PCP Dr. Wiseman noted: "She needs me to hold her over with a month of meds, which are the same ones she was on before and ran out of, leading to the relapse. She feels great on these meds so no urge to drink.  She was self medicating with ETOH [alcohol], and needing it for sleep."  R. 615.

In June 2020, plaintiff relapsed with alcohol and visited the Windham Hospital ED overnight with suicidal thoughts.  She reported "multiple psychosocial stressors including helping her mother get admitted to Natchaug [Hospital] for alcohol detox, depression and anxiety; unemployment, financial, not engaged in treatment and drinking to excess."  She reported drinking about 9-10 nips per day for the prior 6 to 7 weeks.  R. 454.  It appears that plaintiff spent some time receiving psychiatric treatment at Backus Hospital, although that record is not included in the administrative record.  *See* R. 615-16.  She entered Milestones rehab at Community Health Resources for a month starting in July 2020.  R. 615-16, 1153-1207.  During rehab, she admitted that after she left inpatient treatment at the Institute of Living, she "dropped the ball on my psych medications so I started to drink when my mental health increased."  R. 1187.

From rehab, plaintiff went to a residential treatment program at Perception House but left after five days.  R. 616.  PCP Dr. Wiseman bridged her psychiatric medication management

again in September 2020, and indicated that he would refer plaintiff to behavioral health for medication management and therapy. *Id.*

### c.  Period of sobriety in 2020-2021; Consultative exam

As described below, the record indicates that plaintiff did not use alcohol from approximately July 2020 through late 2021 or early 2022. During that sober period, she visited Windham Hospital ED in January 2021 after she overdosed on the Tramadol she was taking for chronic back pain. R. 512. At the time, she reported being 202 days sober. *Id.* She denied that the overdose was a suicide attempt, reported that her bipolar disorder was stable, and denied any depressive symptoms other than occasional insomnia. *Id.* She stated that she was unemployed but looking for a part-time job.

Plaintiff filed the pending application for disability benefits in February 2021. That month, she reported to PCP Dr. Wiseman that she was having generalized anxiety, which she self-medicated with alcohol in the past, and so needed something else for it. R. 644-45. Dr. Wiseman was willing to prescribe clonazepam as long as plaintiff remained sober. *Id.* In March 2021, he prescribed temporary oxycontin for shoulder pain, which "started 3 weeks ago after exercise, doing push ups and running." R. 679.

Two weeks later, in March 2021, psychologist Marc Hillbrand, Ph.D. conducted a consultative mental status examination. R. 668-72. Plaintiff was his principal informant, and he also reviewed her disability application and her 2019 records from United Services. R. 668. Plaintiff reported approximately eight hospitalizations in her life relating to psychiatric and substance use issues, but Dr. Hillbrand noted that she had been sober for nine months. R. 668-69. She recounted that she "has been on and off medications and typically becomes manic after she decides to discontinue medications." *Id.* She reported two inpatient hospitalizations in the

first half of 2020, one for three weeks and the other for thirty days, to treat an increase in

symptoms brought on by the end of a romantic relationship. *Id.* She also reported a history of

alcohol and cannabis abuse, as well as a prior addiction to opioids. R. 669. Plaintiff complained

of "severe" depression and "considerable anxiety." R. 670. Plaintiff also reported having

"passive suicidal thoughts" and acknowledged a history of self-injury since her teens that had

ended only about a year earlier. *Id.* Dr. Hillbrand noted:

> Her affect was tense. She relates in a friendly manner. She has good social skills.
> Speech articulation is within normal limits. Her speech is of average volume and
> pressured. Her thought content is expansive. Thought processes are coherent,
> logically linked, and accelerated. She reports no perceptual abnormalities. The
> data points to a cyclical mood disorder without psychotic features. There is no
> evidence of a cognitive disorder.

Regarding activities of daily living, plaintiff reported that she

> can perform hygiene tasks autonomously unless she is very depressed, which last
> occurred in June 2020. She is able to perform simple household chores. She lives
> with her parents at the present time. She is capable of driving. She manages her
> finances. She has a small social support network.

Dr. Hillbrand concluded: "The prognosis is guarded in light of the chronicity and severity of

mental health and substance abuse problems and the historic pattern of periodic medication non-

adherence." R. 671. He opined that plaintiff had the following impairments:

| | |
|---|---|
| Making judgments on simple work-related decisions | Mild impairment |
| Understand and remember complex instructions | Mild impairment |
| Carry out complex instructions | Mild impairment |
| Make judgments on complex work-related decisions | Mild impairment |
| Interact appropriately with the public | Moderate to marked impairment |
| Interact appropriately with supervisors | Moderate to marked impairment |
| Interact appropriately with coworkers | Moderate to marked impairment |
| Respond appropriately to usual work situation and changes in routine | Marked impairment |
| Maintain attention, concentration and pace | Marked impairment |

8

*Id.* In particular, Dr. Hillbrand wrote: "Her ability to concentrate, persist towards task completion, maintain an appropriate pace, and demonstrate appropriate stamina and stress tolerance appears to be markedly impaired." *Id.* He added: "She does not appear capable of managing her benefits in light of her history." *Id.*

In May 2021, plaintiff sought services at Community Health Resources. R. 1103-1230. She described her current mood as "very poor" and was seeking help to resist cravings for alcohol and opioids. R. 1119. The treatment plan included medication management and meeting with the Pathways to Wellness group three times per week. R. 1123-24. In July 2021, her treatment was adjusted to individual therapy twice per month. R. 1233. Continued therapy until February 2022 was recommended in a November 2021 treatment plan. R. 1237. The administrative record does not include any notes of individual therapy at Community Health Resources, which appears to have lasted between 4 to 6 months.

In September 2021, PCP Dr. Wiseman noted that Community Health Resources was supposed to take over medication management. R. 1272. It is unclear whether that happened: in November 2021, Dr. Wiseman noted that there was no change to psychiatric medications. R. 1269.

### d.  Relapse prior to March 2022 hearing; PCP opinion

In late 2021 or early 2022, plaintiff relapsed into alcohol use. On January 2, 2022 she was charged with a DUI after crashing into a tree. R. 1395-96. However, she did not reveal that to Dr. Wiseman during a January 17 phone visit, which focused entirely on a skin rash and did not address psychiatric issues or substance use. R. 1247-49.

Then, on January 24, 2022, plaintiff went to the Hartford Hospital ED complaining of suicidal ideation and was hospitalized again for two weeks. R. 1395-96. During intake, she

admitted to being noncompliant with psychiatric medications for three months, then realized the

day before how her symptoms were progressing.  *Id.*  She reported recent violent conflicts with

her mother and her boyfriend and obtained a restraining order against the boyfriend.  *Id.*  She

denied daily alcohol use but then admitted drinking at least 10 nips per day.  R. 1396.  Plaintiff

spent two weeks at the Institute of Living during which she completed alcohol detox and

reestablished psychiatric medication management.  R. 1397.  The discharge notes state:

> During admission, patient frequently demonstrated poor boundaries with other
> patients and staff.  She was frequently seeking out staff members and needed
> reassurance.  She was somatically preoccupied.  In terms of safety, the patient was
> admitted with worsening depression and suicidal ideation.  There was a good
> response to treatment and for the last several days prior to discharge the patient
> has been euthymic.  Symptomatically, there was improved mood, decreased
> anxiety, as well as increased hopefulness, and the patient stated feeling better
> since hospitalization.  Patient denied any suicidal ideation.

R. 1397.

The last medical evaluation in the record is a mental impairment questionnaire form

completed by PCP Dr. Wiseman dated February 17, 2022.  R. 1384-87.  Dr. Wiseman noted that

he had first seen plaintiff in 2014 and they had seven visits in fourteen months prior to the

evaluation.  R. 1384.  He further noted the diagnosis of bipolar I, PTSD, depression, anxiety and

personality disorder rendered by her psychiatric providers, *id.*, which is also consistent with Dr.

Hillbrand's March 2021 evaluation.  R. 668-72.  On a checklist, Dr. Wiseman opined that

plaintiff had 30 of 32 possible signs and symptoms of mental impairment, including poor

memory, personality change, mood disturbance, emotional lability, recurrent panic attacks,

anhedonia or pervasive loss of interests, paranoia or inappropriate suspiciousness, difficulty

thinking or concentrating, social withdrawal or isolation, illogical thinking or loosening of

associations, persistent irrational fears, generalized persistent anxiety, hostility and irritability,

and pathological dependence or passivity.  R. 1384.  Dr. Wiseman opined that plaintiff was not a

malingerer, and he noted that despite medication and therapy treatment since age 14, plaintiff

"still has symptoms and periods of poor function."  R. 1385.  He further observed that plaintiff's

psychiatric condition made her headaches, neck, back, and sciatic pain worse.  R. 1386.

Although Dr. Wiseman's handwritten comment under "prognosis" vaguely stated "per psyche –

not me as PCP", *id.*, he opined that plaintiff has moderate limitations in activities of daily living;

extreme limitations in sustaining social functioning; constant limitations in maintaining

concentration, persistence, and peace; and continued episodes of deterioration or

decompensation.  R. 1387.

### 4.  Hearing testimony in March 2022

On March 1, 2022, plaintiff gave testimony before ALJ John Noel.  R. 42-90.  She stated

that apart from a three-week relapse in January 2022, she had been sober for about a year and a

half.  R. 55.  Plaintiff was living with her mother and stepfather.  R. 55.  She helped with trash,

dishes, doing her own laundry, and occasional vacuuming, but spent most of her time alone

watching short "stints" of videos because she cannot focus long enough to watch whole movies.

R. 55-56, 66.  When asked why vacuuming was difficult, she stated: "Just motivation.  All these

medications and my depression really don't allow me to interact with my family too much.  I live

here in the house, but it's like we're living two separate worlds because I'm too sick to really

help."  R. 56.  Plaintiff described being so "retracted" into her room and that she feels as if she is

"laying down 14 hours a day or more."  R. 60.  She also stated she cannot shop for groceries

because she is afraid to leave the house.  R. 57.  She testified that she only showers every five

days when reminded.  R. 60.  She has had a series of short jobs that ended because she clashed

with coworkers.  R. 63-65.  She left her most recent job in March 2020 because the work

environment was intolerable after her boss broke up with her, and she started self-harming

(cutting) again, which she had been doing since she was 28 years old.  R. 67-68.  Plaintiff testified that she frequently seeks emergency treatment for flareups of depression and anxiety, R. 68, and that she has trouble keeping track of her medication and suffers even when taking her medications.  R. 57, 69.  She testified: "I have no friends," R. 69, and that she cannot be out in public with people she does not know.  R. 63.  She then testified that she had a boyfriend for about three months until he attacked her at his house in January 2022.  R. 72-73.  When the ALJ attempted to reconcile this with her prior testimony that she was unable to leave the house, she accused the ALJ of being "flabergistic."  R. 74.  The ALJ asked: "I'm just trying to figure out that if you don't ever leave, how do you meet someone?" and plaintiff responded: "That's the only time I have in the past three years." [4]  *Id.*

### C.  The ALJ's Decision

In the March 16, 2022 decision, the ALJ followed the sequential evaluation process for determining disability under the Social Security Act.  At Step 1, the ALJ found plaintiff did not engage in substantial gainful activity since March 13, 2020, the alleged onset date.  R. 24.  At Step 2, the ALJ found the following severe impairments: bipolar disorder, PTSD, personality disorder, anxiety disorder, substance use disorders, right shoulder tendinitis, and thoracic outlet syndrome.  *Id.*

At Step 3, the ALJ found that, factoring in plaintiff's substance abuse, she would be considered disabled under sections 12.04 and 12.06 of the Listings.  R. 25-27.  However, the ALJ found that in the absence of substance abuse her impairments would not satisfy those criteria.  R. 27-29.

---

[4] Contradictory evidence in the record indicates that plaintiff was in another relationship (at work) in early 2020, R. 392, and injured her wrist while "at her friend's house" in July 2021, R. 1332.

The ALJ then determined plaintiff retains the following RFC:

> [T]o perform light work as defined in 20 CFR 404.1567(b) except she can frequently climb ramps and stairs; frequently reach overhead with the right upper extremity; can perform simple, routine tasks; use judgment limited to making simple, work-related decisions; deal with routine changes in the work setting; have no public contact; and not work on a team with coworkers.

R. 29. At Step 4, the ALJ found plaintiff is still unable to perform past relevant work. R. 34. At Step 5, the ALJ relied on the testimony of a vocational expert to conclude that there are jobs existing in significant numbers in the national economy that plaintiff can perform. R. 34-35. Finally, the ALJ concluded that because substance use disorder was a contributing factor material to the determination of disability, plaintiff was not disabled within the meaning of the Social Security Act. R. 35.

### D.  DISCUSSION

Although the arguments in plaintiff's brief are intertwined, she appears to raise three claims of error. *First*, she claims that the ALJ failed to adequately develop the medical record despite obvious gaps. Pl. Br., ECF 18-1 at 26-27. *Second*, she claims that the record lacks substantial evidence to support either the ALJ's evaluation of medical opinions or his determination that when she is not abusing substances her impairments do not satisfy the criteria of sections 12.04 or 12.06 of the Listings. *Id.* at 20-26. *Third*, plaintiff claims that the ALJ's RFC determination was not supported by substantial evidence because it relied upon flawed opinions issued by the agency consultants on initial review and reconsideration. R. 25.

The crux of all these claims is the ALJ's finding that plaintiff's mental health impairments are not disabling in the absence of substance abuse. R. 25, 27, 34-35. By statute, an individual is not considered disabled for purpose of disability insurance benefits "if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the

Commissioner's determination that the individual is disabled."  42 USC § 423(d)(2)(C).  In other words, where there is a finding of disability but drug addiction or alcoholism ("DAA") is in evidence, the ALJ must examine which limitations would remain in the absence of substance abuse and base the final disability determination solely on those remaining limitations. [5]  20 CFR § 404.1535.  As part of a claimant's general burden of proof at Steps 1 through 4, *see supra*, she bears the bears the burden of proving that substance abuse is immaterial to the determination that she is disabled.  *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 124 (2d Cir. 2012).  Here, plaintiff's central contention is that the ALJ should have concluded that she has disabling limitations even when not engaged in substance abuse.

### 1.  The ALJ did not adequately develop the record

As her first claim of error, plaintiff contends that the ALJ improperly failed to obtain full records of her individual therapy at Community Health Resources ("CHR") in 2021 and the progress notes from her inpatient treatment at the Hartford Hospital Institute of Living ("IOL") in 2020 and 2022,[6] which left an obvious and material gap in the record.  *See* Pl. Br. at 26.  It is well established that "where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel or by a paralegal."  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (cleaned up); 20

---

[5] To the extent that plaintiff's brief suggests that her substance abuse was a symptom of, or caused by, her mental impairments, *see* Pl. Br. at 23, that would not change the DAA analysis required by the statute.  *See Smith v. Comm'r of Soc. Sec.*, 572 F. App'x 363, 369 (6th Cir. 2014) (rejecting argument that statute does not apply where substance abuse is symptom of mental disorder, reasoning that "[t]he statute does not create [an] exception based on the cause of the addiction").

[6] Plaintiff also contends that the ALJ should have requested records from intensive outpatient treatment at Natchaug Hospital.  However, the 12/19/19 record first mentioning that treatment suggests that it occurred more than 12 months prior to the application date.  *See* R. 294 ("Natchaug IOP multiple times, IOL inpatient 2X in 1996 and 2020 and has been to detox 6X.").

C.F.R. § 404.1512(b)(1) (agency must develop "complete medical history" from at least 12 months prior to application).  The reverse is also true: the ALJ is not obligated to seek additional information "where there are no obvious gaps in the administrative record."  *Id.* at 79 n.5.

Of note here, the duty to develop the record "is particularly important where an applicant alleges [she] is suffering from a mental illnesses, due to the difficulty in determining 'whether these individuals will be able to adapt to the demands or "stress" of the workplace.'"  *Hidalgo v. Colvin*, No. 12-cv-9009 (LTS), 2014 WL 2884018, at *4 (S.D.N.Y. June 25, 2014) (quoting language from SSR 85-15).  Accordingly, numerous district court decisions have held that the ALJ has a "heightened duty" to develop the record where mental impairment is at issue.  *See*, *e.g.*, *Cassandra S. v. Kijakazi*, No. 22-cv-328 (MPS)(RMS), 2023 WL 2867068, at *12 (D. Conn. Jan. 30, 2023) (collecting decisions); *Gabrielsen v. Colvin*, No. 12-cv-5694 (KMK)(PED), 2015 WL 4597548, at *4 (S.D.N.Y. July 30, 2015) (collecting district court decisions in this circuit and others).

The Commissioner concedes that the ALJ did not obtain progress notes or therapy notes from IOL inpatient stays in 2020 and 2022 and outpatient treatment at CHR in 2021.  However, the Commissioner argues that the ALJ fulfilled his duty by requesting records from both providers and then obtaining confirmation from plaintiff's hearing counsel that those records – which the medical providers supplemented in the weeks before the hearing[7] – were complete.  Def. Br., 22-1 at 9-12.  The Commissioner also notes that the ALJ left the record open for two weeks post-hearing to allow plaintiff's counsel an opportunity to supplement.  *Id.*

---

[7] The record confirms that the agency sent a request to IOL on February 5, 2021 and to CHR on July 28, 2021.  R. 289, 1131.  Both providers sent two rounds of records.  IOL sent discharge summaries in February 2021 and February 2022.  R. 283-89, 1390-1401.  CHR sent intake records and treatment plans in July 2021 and February 2022.  R. 1103-35, 1136-1238.

While the Commissioner is correct that subpoenaing records pre-hearing and leaving the administrative record open post-hearing for supplemental submissions may contribute to a finding that the ALJ fulfilled his duty to develop the record,[8] the Court must also examine whether the ALJ should have known that the submissions were incomplete and whether the missing information was significant.  The Second Circuit has reiterated that the ALJ's duty is to make "reasonable efforts" to develop the record and held that the ALJ's duty is satisfied if the agency requested records and "nothing in the record suggests that the ALJ should have known that [the provider]'s response was incomplete." *Drake v. Astrue*, 443 F. App'x 653, 656 (2d Cir. 2011); *see also Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (ALJ has no obligation to seek additional information where there are "no obvious gaps").  The Second Circuit has also observed that the issue of adequacy turns on the materiality or significance of the records alleged to be missing.  *See Morris v. Berryhill*, 721 F. App'x 25, 28 (2d Cir. 2018) (contrasting missing records of a "serious and critical event" that could "materially change the weight of the evidence" with "routine" check-up and progress notes of which there was "no indication that they contain significant information"). [9]

---

[8] *See Frye ex rel. A.O. v. Astrue*, 485 F. App'x 484, 488 n.2 (2d Cir. 2012) (record was adequate where ALJ requested any additional evidence prehearing, held record open post-hearing, contacted counsel when none was received, and granted extension of time to supplement); *John C. v. Kijakazi*, No. 3:22-cv-1073 (SVN), 2023 WL 6210994, at *6 (D. Conn. Sept. 25, 2023) (record was adequate where ALJ held record open for two weeks post-hearing and allegedly missing records did not appear to be significant).

[9] For example, courts have remanded for failure to develop the record where an ALJ cited missing records to support an adverse finding, *see Thomas v. Comm'r of Soc. Sec.*, No. 20-cv-5086 (PKC), 2022 WL 523544, at *6 (E.D.N.Y. Feb. 22, 2022), where an ALJ drew conclusions about the efficacy of physical therapy that was referenced in the record but not actually included, *see Boswell v. Comm'r of Soc. Sec.*, No. 21-cv-2364 (JPC)(GRJ), 2022 WL 3714669, at *6 (S.D.N.Y. Aug. 29, 2022), and where an ALJ faulted the claimant for failing to pursue treatment but the PCP's notes indicated plaintiff did pursue other treatment for which the ALJ did not

Turning first to the progress notes of IOL inpatient stays, the ALJ was aware that they were missing, as noted by plaintiff's counsel at the hearing. R. 46. Nonetheless, plaintiff has not met her burden of demonstrating that the missing records were significant or material. *See Jennifer Lynn E. v. Kijakazi*, No. 3:20-cv-695 (TOF), 2021 WL 4472702, at *6 (D. Conn. Sept. 30, 2021) (plaintiff bears burden of showing that missing records would undermine ALJ's conclusions) (citing *Santiago v. Astrue*, No. 3:10-cv-937 (CFD), 2011 WL 4460206, at *2 (D. Conn. Sept. 27, 2011)). The IOL progress notes are likely to be cumulative of the discharge summaries already provided, which included information concerning plaintiff's progress from admission to discharge. R. 283-87, 1390-1401. In fact, plaintiff's hearing counsel conceded as much when, while acknowledging that IOL sent the recent discharge summary without progress notes, he nonetheless stated: "I believe we have everything. . . . I don't know if you need the whole record." R. 46. The ALJ concurred "if it's just the summary, I'm sure it's fine" but left the record open for two weeks to allow plaintiff to add the progress notes, if she wished. *Id.* This exchange buttresses the conclusion that the IOL progress notes were not material to the ALJ's disability determination and that plaintiff was not harmed by their absence.

However, the same is not true of the missing CHR therapy notes. As a threshold matter, the ALJ should have known that the CHR records were incomplete given that the CHR treatment plans prescribed therapy for a period spanning July 2021 to February 2022 (R. 1231-38), the November 2021 CHR treatment plan (R. 1237) indicates that plaintiff had, in fact, been in individual therapy for at least 4 months, and PCP Dr. Wiseman confirmed in a September 2021 note that plaintiff "is in therapy 1 on 1 for PTSD with CHR. . . . The plan is for CHR to take

_____

request records, *see Ubiles v. Astrue*, No. 11-cv-6340 (MAT), 2012 WL 2572772, at *10 (W.D.N.Y. July 2, 2012).

over the psyche meds from me" (R. 1272).  Additionally, the January 24, 2022 admission note

from plaintiff's detox and psychiatric hospitalization states: "She had been seeing a therapist for

PTSD from CHR and was told this week that her therapist is leaving.  She reports being

incredibly distressed by being told this on their last session with no plan for a new provider. . . .

She reports feeling betrayed and abandoned."  R. 1395.  These references put the ALJ on notice

that plaintiff was in individual therapy at CHR and that there was an obvious gap in the records

sent by CHR.

As for the materiality, the putative CHR therapy records, in contrast to the IOL records,

are not cumulative of other evidence – in fact, they would be the sole potential source of regular

insight into plaintiff's condition over six months (July to December 2021) during which her

functional capacity was not impacted by substance abuse.  *See* R. 54-55 (plaintiff testified on

March 1, 2022 that she had been sober for a "year and a half" except for a three week relapse in

January 2022).  The CHR records include a May 2021 CHR intake (R. 1208-30) and treatment

plans from July and November 2021 (R. 1231-38).  Only the May 2021 intake notes have

substantive detail regarding plaintiff's mental health status – the treatment plans do not.  Nor did

plaintiff obtain psychiatric care elsewhere during the latter half of 2021.  Consequently, the

therapy notes are likely to contain details that are not available elsewhere in the record.

Furthermore, the missing therapy records are likely material to the ALJ's conclusion that

plaintiff met the criteria of Listings 12.04 and 12.06 in the context of substance abuse but that

her mental health impairments were not disabling when she was sober.  The CHR treatment

appears to have lasted from May 2021 to at least December 2021, *see* R. 1395 (January 2022

report that plaintiff was distraught by news "this week" that therapist was leaving), and was

bookended by two other key events.  First, before the CHR treatment, consultative psychologist

Dr. Hillbrand examined plaintiff in March 2021 – who was almost nine months sober at the time – and opined that her cognition was mostly intact but that she had moderate to marked impairments in social and adaptive functioning.  R. 668-72.  After the CHR treatment, plaintiff suffered a precipitous relapse in January 2022, was charged with a DUI, and entered inpatient detox and psychiatric treatment.  R. 1390-1401.  Regular CHR therapy notes from the months between these key events likely contain insights into plaintiff's contemporaneous mental health condition and its impact upon her functional capacity during an extensive period of sobriety that are not available elsewhere.  Furthermore, the discussion of this period in the ALJ's decision is fairly terse.  The decision refers to plaintiff's intake at CHR in May 2021 but does not acknowledge that she was attending individual therapy there for many months, and the only other discussion of plaintiff's condition during the latter half of 2021 is to note that she suffered a wrist injury at a friend's house and so must have been able to "have friends and leave the house." *See* ALJ Decision, R. 31 and 33 (twice citing a sentence in a 7/28/21 orthopedic note that plaintiff injured her wrist at a friend's house).  In short, the missing therapy notes are likely to be material to the ALJ's determination.

The CHR therapy notes also might be material to the ALJ's findings as to the weight of medical opinions.  The ALJ found that the opinions of non-examining agency consultants Pamela Fadakar, M.D. (R. 92-99 dated 3/24/21) and Ellen Ryan, M.D. (R. 106-10 dated 8/3/21) were more persuasive than the opinion of plaintiff's PCP Dr. Wiseman (R. 1384-87).  Without reaching the merits of that finding, it is noteworthy that the agency consultants issued their opinions on March 24, 2021 and August 3, 2021 prior to the completion of the individual therapy at CHR and without the benefit of the therapy notes, whereas Dr. Wiseman's treatment was ongoing through the date of his written opinion in February 17, 2022, including management of

plaintiff's psychiatric medications in the latter half of 2021.  *See* R. 1269, 1272.  Here again, the notes would provide empirical insight during the intervening period regarding the numerous signs and symptoms noted by Dr. Wiseman and his opinion that plaintiff had *extreme* difficulties in maintaining social functioning, *constant* deficiencies of concentration, persistence or pace, and *continual* episodes of deterioration or decompensation in work or work-like settings.  R. 1387.

In summary, without reaching the merits of the ALJ's findings as to plaintiff's functional capacity in the absence of substance abuse or the weight he assigned to medical opinions, the CHR therapy notes from the latter half of 2021 likely have information concerning plaintiff's mental state and activities that "could materially change the weight of the evidence" underlying the ALJ's conclusion that plaintiff would not be disabled in the absence of substance abuse, such that the record is incomplete without them.  *See Morris*, 721 F. App'x at 28.  Consequently, and in light of the ALJ's heightened duty to develop the record where the claimant alleges mental illness, the undersigned recommends that the case be remanded for further development of the record.

### 2.  Based on the current record, the other claims of error do not warrant remand

If the Court concurs with the above recommendation, then the other claims of error are moot and plaintiff's application should be reassessed in light of the supplemental evidence.  *See Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 267 (S.D.N.Y. 2016) (completeness of record is a threshold issue).  If, however, the Court concludes that the record was adequately developed, then the undersigned recommends that the other claims of error do not warrant remand, as follows.

### a. Substantial evidence supports the ALJ's findings as to plaintiff's level of function in the absence of substance use

Plaintiff's second claim of error is that the ALJ's findings concerning her level of function in the absence of substance use are not supported by substantial evidence. Specifically, plaintiff asserts that the ALJ's evaluation of the medical opinions of Dr. Hillbrand and Dr. Wiseman and his finding of no listed impairment at Step 3 – which all turn on the question of plaintiff's level of function when sober – do not have adequate support in the record. Pl. Br. at 21-24, 24-27.

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). It must be "more than a mere scintilla or touch of proof here and there in the record." *Id.* If the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982). In other words, the court can reject an ALJ's factual findings "only if a reasonable factfinder would have to conclude otherwise." *Schillo v. Kijakazi*, 31 F.4th 64, 74 (2d Cir. 2022).

In her brief, plaintiff focuses on the ALJ's conclusions concerning the "paragraph B" criteria of Listings 12.04 (depressive, bipolar, and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders). [10] Plaintiff disputes the ALJ's conclusion that, in the absence of substance abuse, she had only a *mild* limitation in understanding, remembering, or applying information, and only a *moderate* limitation in interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself. *See* R. 27-28. In particular, she argues

---

[10] In order to meet the paragraph B criteria, a claimant must have an extreme limitation, or two marked limitations, in: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself. *See* Appendix 1 to 20 C.F.R. Part 404, Subpart P §§ 12.04 and 12.06.

that the ALJ ignored evidence that she struggles with activities of daily living and social

activities even in the absence of substance use.  Pl. Br. at 21-22.

The record does contain evidence showing greater limitations than the ALJ concluded.

For example, in the February 2021 function report (a/k/a Activities of Daily Living or ADLs)

that plaintiff submitted in support of her application, she wrote that she struggles with any

activities other than watching TV; can clean the house if not experiencing anxiety but usually

cannot leave due to anxiety attacks; usually does not eat due to depression; only showers every

few days; only changes out of pajamas every 2-3 days; only sleeps 2-3 hours per night; has

terrible memory; has difficulty following instructions; does not get along with people; is afraid to

go outside, talk to people, drive, and be alone; has no social activities; and does not leave the

house.  R. 228-35.  Regarding her ability to work, she added:

> Over time and at every job I have not been able to hold jobs due to my illnesses.  I
> suffer from so much anxiety, and people take it wrong.  For this I have not been
> hired, I've been fired and this has gone on since I started working at 15 years old.

R. 235.  Plaintiff's brief points to similar reports at the March 2022 hearing, such as her

testimony that she showers every five days; did not get along with others during outpatient

therapy; lost jobs due to personality differences, or because she was absent-minded and had a

clash with a supervisor giving feedback, or because of her attitude, or because she thought

people were out to get her, or because she was out of control.  R. 42-74.  The brief also notes that

plaintiff had emotional outbursts directed at the ALJ, including calling the ALJ "flabergistic" and

cursing audibly during the vocational expert testimony.  R. 74, 77.  Plaintiff's brief also cites her

a May 2021 therapy intake (during a period of sobriety) that states:

> She reported to fear abandonment; reported a pattern of unstable and intense
> interpersonal relationships; markedly unstable self-image; being impulsive, being
> promiscuous and engaging in self-injurious behavior; having a hx of recurrent
> suicidal ideation; being irritable; being anxious; having feelings of emptiness; and

> having inappropriate anger.  Reported to starve herself at times.  Because she
> thinks, "I don't deserve to eat."

R. 1104.  The brief also cites plaintiff's hospital intake during her February 2022 relapse in

which she described dysfunctional and violent family and romantic relationships.  R. 1395.

As plaintiff cites in her brief, the other notable evidence in favor of her argument are the

opinions of consultative examiner Dr. Hillbrand and PCP Dr. Wiseman.  Dr. Hillbrand opined in

March 2021 that plaintiff had *moderate to marked* impairment in social interactions with the

public, supervisors, and coworkers, and *marked* impairments in concentrating, persisting, or

maintaining pace and in adapting to usual work situations and changes in routine.  R. 671.

Similarly, Dr. Wiseman opined in February 2022 that plaintiff had poor memory and difficulty

thinking or concentrating as well as *extreme* limitations in sustaining social functioning; *constant*

limitations in maintaining concentration, persistence, and peace; and *continued* episodes of

deterioration or decompensation.  R. 1384, 1387.

However, the existence of evidence to support plaintiff's position does not answer the

question of whether the ALJ's conclusion was supported by substantial evidence.  "Even where

the administrative record may also adequately support contrary findings on particular issues, the

ALJ's factual findings 'must be given conclusive effect' so long as they are supported by

substantial evidence."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing *Schauer v.*

*Schweiker*, 675 F.2d at 57).

Here, the ALJ acknowledged plaintiff's subjective reports in her ADLs and hearing

testimony (see R. 25-26, 29), as well as the opinions of Dr. Hillbrand and Dr. Wiseman (R. 26-

27, 32-33), but relied on substantial contradictory evidence from plaintiff's period of sobriety

indicating that plaintiff's limitations were less severe in the absence of substance abuse.

Accordingly, he concluded that plaintiff's limitations were not as severe as Dr. Hillbrand and Dr.

Wiseman opined (R. 32-33) and that plaintiff did not meet the requirement of demonstrating two marked limitations or one extreme limitation in the paragraph B criteria in order to satisfy Listings 12.04 or 12.06 (R. 27-29).

Regarding understanding, remembering, or applying information, the ALJ found only a mild limitation in the absence of substance use, consistent with Dr. Hillbrand's opinion that plaintiff had a mild memory limitation but normal responses on a Cognistat test and average intellectual ability (R. 670-71); CHR providers conducting intake in May and July 2021 observed that plaintiff's thought processes and insights were organized and intact (R. 1116-17, 1173); and emergency providers in May 2019 and January 2021 found organized and normal thought processes (R. 516, 670). Plaintiff herself also reported to Dr. Hillbrand in March 2021 that she can perform hygiene tasks autonomously unless she is very depressed, which last occurred in June 2020, and can perform simple household chores, drive, and manage her finances (although he did conclude that she is not capable of managing her benefits "in light of her history"). R. 670-71. Consequently, the ALJ's finding of only a mild limitation in connection with understanding, remembering or applying information is adequately supported.

Regarding interacting with others, the ALJ found that plaintiff had a moderate limitation in the absence of substance use, which again is partially consistent with Dr. Hillbrand's opinion, which found "moderate *or* marked" limitation in social functioning. R. 671 (emphasis added). The ALJ contrasted plaintiff's testimony that she cannot leave the house and has no friends with a medical record showing she was injured at a friend's house in July 2021 (R. 1332) and spent time at a boyfriend's house in January 2022 (R. 1395).[11] She held a job at a sawmill from July

---

[11] Plaintiff's testimony concerning this relationship was confusing and inconsistent. *See* R. 71-74.

2018 through March 2020, during which she dated a supervisor. R. 213, 392. She reported to

Dr. Hillbrand in March 2021 that she had a small social support network. R. 670. The ALJ also

noted that plaintiff had friendly and appropriate interactions with medical providers throughout

the record (R. 668, 1116), and with the treatment team, peers, and groups post-detox during her

February 2022 inpatient stay (R. 1390). So this finding, too, is adequately supported.

Regarding adapting or managing herself, the ALJ found that plaintiff had a moderate

limitation in the absence of substance use. He noted plaintiff's report to Dr. Hillbrand that she is

able to perform household chores, drive, and manage her finances. R. 670. The ALJ also noted

that plaintiff has a history of suicidal ideations and once required hospitalization in October 2019

in the absence of substance use (R. 344, 624) but that the multiple inpatient hospitalizations in

March 2020, June 2020, and January 2022 all related to substance use. The ALJ also noted that

the hospitalizations were preceded by noncompliance with psychiatric medications. [12] R. 28, *see*

R. 810 (October 2019), 286 (March 2020), 1187 (June 2020), 1395 (January 2022). In fact, the

longest period of sobriety, which was the approximately eighteen months between July 2020 and

December 2021 is notable for the lack of intensive psychiatric treatment. Instead, in addition to

---

[12] Although failure to follow prescribed treatment may be a basis for denying benefits, *see* 20
C.F.R. § 404.1530; SSR 18-3p, or for discrediting a claimant's subjective reports, *see Suttles v.
Colvin*, 654 F. App'x 44, 46 (2d Cir. 2016), that is not how the ALJ analyzed plaintiff's
medication noncompliance here. Instead, the ALJ simply noted that plaintiff gets good results
from psychiatric medications and that stopping medications causes an increase in symptoms (*see*
R. 28-31), which is an appropriate way to consider such evidence. *See, e.g., Crystal P. v.
Kijakazi*, No. 5:20-cv-201, 2022 WL 16820981, at *11 (D. Vt. Jan. 25, 2022) (rejecting
argument that ALJ implicitly concluded that noncompliance with medication caused claimant's
mental health problems; ALJ properly considered evidence that condition improved with
medication when considering claimant's limitations).

Relatedly, neither plaintiff's brief nor the ALJ's decision discusses whether medication
noncompliance might be a symptom of plaintiff's mental impairments, so that question is not
addressed herein.

medication management, her sole mental health treatment consisted of medication management

by PCP Dr. Wiseman (R. 616, 644-45, 1269, 1272) and group meetings followed by individual

therapy at Community Health Resources from May to December 2021 (R. 1138-1238), which

ended due to a substance use relapse.  And in January 2021, despite visiting the Windham

Hospital ED after an overdose of back pain medication and despite having been off her

medications for three months (R. 550), the notes stated:

> Pt has a history of Bipolar Disorder and alcohol abuse. She reports that she has
> been clean from alcohol 202 days.  She denies that this overdose was a suicide
> attempt and reports that she feels that her Bipolar Disorder is stable.  She denies
> any depressive symptoms other than occasional insomnia.  She is now living with
> her sister in Mansfield, she is unemployed however is looking for a part time job.
> She denies having any thoughts to end her life and denies any gestures since her
> last ED visit in June 2020.

R. 512.  Accordingly, the record provides adequate support for the ALJ's finding as to adapting

and managing herself.

Regarding concentrating, persisting, or maintaining pace, the ALJ found that plaintiff had

a moderate limitation.  He noted Dr. Hillbrand's observation that plaintiff had some trouble

exerting sustained mental effort and that concentration was an area of relative weakness (R. 669)

but plaintiff also told him that she can accomplish simple household chores (R. 670), which is

consistent with her testimony (R. 55-56) and with the portion of her ADLs report stating that she

can make her bed, vacuum, and do laundry (R. 229).  Additionally, medical examinations when

plaintiff was sober consistently noted that she was alert and oriented, with coherent and logical

thoughts (R. 316, 1173, 1400).  This is the weakest point in the ALJ's paragraph B analysis,

insofar as the evidence just cited is minimal and arguably is not directly relevant to the question

of concentration, persistence, and pace.  However, elsewhere in the decision, the ALJ cited an

examination at Community Health Resources that included the observation "concentration is

full." R. 1179. And even assuming that the ALJ had found a marked limitation under this criterion, more the paragraph B criteria require more than one marked limitation to establish disability under Listings 12.04 or 12.06, which does not exist here.

In summary, the record contains substantial evidence to support the ALJ's conclusion that the opinions of Dr. Hillbrand and Dr. Wiseman were only partially persuasive and his finding that plaintiff did not meet the criteria of Listings 12.04 or 12.06. Although other evidence in the record likely could support a conclusion that plaintiff has a marked impairment in one or more of those criteria, "[t]he court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Hum. Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984). Consequently, the ALJ's Step 3 findings and evaluation of the opinions of Dr. Hillbrand and Dr. Wiseman should be affirmed.

### b. The ALJ's RFC determination did not rely on unsupported opinions

Plaintiff's final argument is that the ALJ's RFC determination was not supported by substantial evidence because it relied upon flawed opinions issued by the agency reviewers at the initial review and reconsideration levels. R. 25. Focusing on the opinion of agency reviewer Dr. Ellen Ryan (R. 106-10), plaintiff disagrees with her statement that plaintiff was at her most recent job for approximately two years (R. 107), and plaintiff notes that the correct timeframe was 20 months. That is a distinction without a difference because it still contradicts plaintiff's assertion that "I am unable to hold a job for more than a few months" (R. 228), as Dr. Ryan noted. Plaintiff also criticizes Dr. Ryan's assertion that plaintiff "reports greater adaptive capability per CE than on ADLs." R. 107. But that statement is correct: plaintiff reported to consultative examiner Dr. Hillbrand that she can perform hygiene tasks autonomously unless she

is very depressed, can perform simple household chores, is capable of driving and managing her finances, and has a small social support network (R. 670), but in her ADLs, she reported that she cleans the house but does not shower, does not eat, dresses only every 2-3 days, and does not drive (R. 229).  Lastly, plaintiff contends that plaintiff's statements in her ADLs are not contradicted in the longitudinal record, but that is inaccurate, as discussed above.  Consequently, plaintiff's criticisms of Dr. Ryan's opinion, and of the ALJ's partial reliance on that opinion, are unfounded.

### E.  CONCLUSION

For the above reasons, the undersigned recommends that plaintiff's Motion to Reverse the Decision of the Commissioner, ECF 18, be GRANTED as to the claim that the ALJ failed to adequately develop the record, and the case be remanded for further development of the record – including records of individual therapy at Community Health Resources from July 2021 to at least December 2021 – and reassessment based on the amplified record.

Any party may seek the district court's review of this recommended ruling.  *See* Fed. R. Civ. P. 72(b)(2) (written objections to proposed findings and recommendations must be filed objections to recommended ruling due fourteen days after being served).  Failure to file timely objections will preclude appellate review.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72 and 6(a); D. Conn. L. Civ. R. 72.2; *Small v. Secretary of H.H.S.*, 892 F.2d 15 (2d Cir. 1989) (per

curiam); *F.D.I.C. v. Hillcrest Assoc.*, 66 F.3d 566, 569 (2d Cir. 1995).

SO ORDERED, this 22nd day of February, 2024, at Bridgeport, Connecticut.


*/s/ S. Dave Vatti*
S. DAVE VATTI
United States Magistrate Judge